[Cite as *In re C.B.*, 2016-Ohio-1575.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

IN RE:

       C.B.

ADJUDICATED DELINQUENT CHILD.

CASE NO. 16-15-09

**O P I N I O N**

Appeal from Wyandot County Common Pleas Court
Juvenile Division
Trial Court No. A2111109

**Judgment Affirmed**

**Date of Decision: April 18, 2016**

APPEARANCES:

    *Todd A. Workman* **for Appellant**

    *Eric J. Figlewicz* **for Appellee**

**ROGERS, J.**

{¶1} Defendant-Appellant, C.B., appeals the judgment of the Court of Common Pleas of Wyandot County Juvenile Division placing him into temporary foster care. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On October 6, 2014, a motion to show cause as to why C.B. should not be found in violation of the terms and conditions of his probation was filed in the Court of Common Pleas of Wyandot County Juvenile Division. C.B. was initially placed on probation in 2010 after being adjudicated a delinquent child. Prior to this motion, C.B. admitted to two prior probation violations on November 8, 2011 and November 25, 2013. In the October 6, 2014 motion to show cause, it was alleged that C.B. violated four rules of his probation.

{¶3} C.B. admitted to these violations, and by way of entry filed on January 14, 2015, the trial court found that C.B. violated the terms of his probation. The case proceeded to disposition where the court ordered that C.B.'s probation shall continue; C.B. shall serve 90 days at the Juvenile Detention Center ("JDC"), all of which were stayed on the condition that he follow the rules of probation; C.B. shall be committed to foster care, which was stayed on the condition that he follow the rules of probation; C.B. and his mother, Betty Beekman, shall complete therapy sessions; the Wyandot County Department of Job and Family Services

("DJFS") shall continue protective supervision; and C.B. shall attend intensive anger management counseling sessions.

{¶4} On January 27, 2015, DJFS filed a motion to terminate protective supervision of C.B. because Beekman informed DJFS that she and C.B. would be leaving Ohio to stay with family in North Carolina. The motion was granted later that day.

{¶5} The court reinstated its January 14, 2015 order and ordered DJFS to provide protective supervision to C.B. on March 16, 2015 after Beekman and C.B. returned to Ohio from North Carolina.

{¶6} DJFS filed a motion for a review hearing pursuant to R.C. 2151.417(A) on July 8, 2015. The motion was granted and a hearing was set for a later date.

{¶7} On July 21, 2015, a motion to show cause as to why C.B. should not be found in violation of the terms of his probation was filed. Specifically, the motion alleged that C.B. had violated three rules of his probation.

{¶8} That same day, DJFS filed a motion to dissolve the stay of commitment to foster care.

{¶9} A supplemental motion to show cause as to why C.B. should not be found in violation of the terms of his probation was filed on August 12, 2015. In

the supplemental motion, it was alleged that C.B. violated at least one rule of his probation.

{¶10} A hearing regarding DJFS's motion to dissolve the stay of commitment to foster care was held on September 11, 2015.

{¶11} Deputy Chris Verhoff of the Wyandot County Sheriff's Office was the first to testify. Deputy Verhoff testified that he was working on September 2, 2015. He stated that he was dispatched to Beekman's house at approximately 10:56 pm due to the report of an unruly child. He later learned that the child in question was C.B.

{¶12} Upon arrival at the home, Deputy Verhoff explained that he met Beekman, C.B., and Beekman's daughter. He added that the household seemed clean, but the tensions seemed high amidst the individuals present. Specifically, Deputy Verhoff remembered Beekman appearing to be upset.

{¶13} Deputy Verhoff recalled his conversation with C.B. that night and testified that C.B stated "that he had gotten upset with his mother over the fact that she didn't take him back into Sycamore to grab his wallet, that he thought he forgot. After they had a verbal argument, he ended up squirting ketchup all over the front of her." Trial Tr., p. 8. Further, C.B. informed Deputy Verhoff that he was on probation and that other law enforcement officials had recently visited the home in the couple weeks prior to this incident.

{¶14} On cross-examination, Deputy Verhoff admitted that C.B. did not harm anyone or threaten to harm Beekman on this occasion. Although he stated that this incident was minor compared to other complaints, Deputy Verhoff explained that it can become a problem if this type of incident was an ongoing behavior.

{¶15} Marc Mays was the next witness to testify. Mays testified that he was a probation officer with the Wyandot County Juvenile Court. Mays stated that C.B. was currently on probation with him and that C.B. had been on probation since June 21, 2010 after being adjudicated a delinquent child.

{¶16} Mays identified a copy of the rules of probation for Wyandot County Juvenile Court, which was signed by C.B. and later admitted into evidence. Some of the rules included that C.B. was to obey his mother, attend school, get good grades, do what is asked of him, etc. Mays testified that C.B. had violated several of the rules of C.B.'s probation.

{¶17} Mays explained that C.B. was ordered to attend summer school through the Sentinel Career Center ("Sentinel"). Mays stated that C.B. attended some classes, but missed a few as well. Mays added that C.B. would not attend class claiming to be sick, although Mays stated that C.B. did not appear to be sick on those days. At the time of the hearing, Mays testified that C.B. was performing well at the beginning of the school year.

{¶18} Mays stated that he had tried other techniques to get C.B. to comply with his probation before resorting to filing the motions to show cause. Specifically, Mays recalled that C.B. was placed on house arrest; C.B.'s electronic devices were taken from him; C.B. was placed into a drug counselling program and given other forms of counseling, including in-house counselling; C.B.'s driver's permit was taken; C.B. had been placed in the JDC three times as a consequence for his behavior; C.B. was ordered to do work at the probation office and even performed litter duty at the county fair. When asked if he could recall which incident gave rise to which consequence, Mays explained that he could not remember because there were so many incidents involving C.B.

{¶19} Mays testified that C.B. continued to violate the terms of his probation after the motion to dissolve the stay of foster care was filed. Specifically, he stated that C.B. had missed school twice and failed to follow school procedures regarding signing out of the building.

{¶20} Mays recalled a meeting he had with Beekman at her request on June 30, 2015. At the meeting, Beekman told Mays that C.B. had been staying up late and setting things on fire. Additionally, C.B. had made "work[s] bombs."[1] *Id.* at p. 19. Mays stated that he talked with C.B. about it and C.B. admitted to doing those things because C.B. was bored.

---

[1] A "works bomb" consists of several substances that when mixed together and "placed in a capped plastic bottle causes the bottle to rupture." *In re S.R.*, 182 Ohio App.3d 803, 2009-Ohio-3156, ¶ 2 (12th Dist.).

**{¶21}** Mays testified that an incident occurred between C.B. and Beekman on July 13, 2015 where the two had gotten into an argument. Mays explained that family members were called to the house to calm C.B. down and those members informed Mays of the incident. During this argument, Mays stated that C.B. admitted to kicking in Beekman's bedroom door. As a result, Mays added that he was concerned for Beekman's safety. Mays testified as to another incident involving C.B. and Beekman that occurred on August 8, 2015 where the argument escalated to the point where Beekman had to leave the property and have her daughter come over and remove C.B. from the house. C.B. also admitted to breaking into Beekman's medicine box, which is kept locked, and taking prescription ibuprofen and tramadol.

**{¶22}** Since the motion to dissolve the stay of foster care was filed, Mays stated that he had moved the court to dissolve several of C.B.'s stayed days of detention in the JDC. Specifically, C.B. was sent to the JDC due to the incident that Deputy Verhoff testified about; in May 2015 for not getting up in time for school; an instance involving horseplay on the school bus; in December 2014 for failing to do schoolwork and lying about it; and for admitting to marihuana use.

**{¶23}** Mays estimated that he was aware of somewhere between eight and ten instances of when C.B. was verbally abusive to Beekman.

{¶24} Mays testified that C.B. was caught taking pictures of his underage niece and then using them to masturbate. However, C.B. told Mays that he never touched his niece inappropriately.

{¶25} Mays stated that any disobedience by C.B. constituted a probation violation under Rule 3, which included not doing what he was told, either at home or at school, not doing homework, not getting good grades, and not listening to Beekman when she told him what to do. Mays added that C.B. violated Rule 16 when he lied to Mays, which occurred several times.

{¶26} On cross-examination, Mays testified that C.B. could receive more home based therapy, which could include him, Beekman, and other family members. He explained that C.B. had been diagnosed with ADHD, but added that C.B. had failed to take his medication on several occasions. Mays clarified that the two days C.B. missed that year of school were two half days.

{¶27} Mays admitted that if C.B. was placed into foster care then it would be quite likely that C.B. would be displaced from Sentinel. Mays stated that Sentinel was a good program, but was confident that other schools offered similar programs.

{¶28} Mays testified that C.B. told him that C.B. "had hit [Beekman] so many times that [C.B.] couldn't remember." *Id.* at p. 35. He admitted that neither Beekman nor any other person had reported that C.B. had ever hit Beekman.

Mays recalled suggesting that C.B. see a psychologist, but Beekman was adamant that C.B. did not need one. When asked by counsel whether he was aware of any other resources available to help C.B., Mays replied, "I don't know of anything else. I've exhausted all resources that I'm aware of." *Id.* at p. 37.

{¶29} Although C.B. had nearly completed his drug counseling and was doing well in school, Mays explained that all this good behavior was negated by all the negative behaviors at home.

{¶30} On re-direct-examination, Mays testified that Beekman seemed to lack the ability to discipline C.B. properly. When C.B. acted up, Mays stated that Beekman made excuses for C.B. by stating that C.B. was upset or forgot to take his medication.

{¶31} On examination by the court, Mays testified that Beekman was 74 years old.

{¶32} Erin Jensen was the next witness to testify. Jensen testified that she worked as a home based therapist for Firelands, through Seneca and Wyandot County. Jensen explained that she served as C.B. and Beekman's home based therapist. She stated that she began treatment in June 2015. Specifically, Jensen explained that she met with the family once a week for two hours at a time in the family home and provided case management services.

{¶33} Regarding C.B. and Beekman's specific program, Jensen testified that she attempted to help with parenting skills, appropriate ways to handle anger for both parties, how Beekman could respond to manipulative behavior, and ways to address C.B.'s aggressive behaviors. During the three months of treatment, Jensen added that no new issues had come into existence, but explained that the family was still dealing with the same problems as before.

{¶34} On cross-examination, Jensen testified that she and the family had completed 13 sessions. Jensen stated that both Beekman and C.B. participated during the sessions by asking and answering questions.

{¶35} Jensen explained that the therapy offered to Beekman and C.B. was typically a short term model. She testified that the cases were reviewed every three months to determine if therapy should continue, but added that most families were not seen more than a year, although there was no strict time limit.

{¶36} April Allison was the final witness to testify. Allison testified that she was employed by DJFS and served as a worker in the social services unit. Allison testified that C.B. had previously been placed into foster care in January 2014 and was reunified with Beekman six months later. During his time in foster care, Allison reported that C.B. fared well to the point where reunification with Beekman was possible.

{¶37} Allison stated that she made monthly visits to the family home after C.B. had left foster care. Allison testified that her last visit with the family was towards the end of July 2015. Allison explained, "At my last home visit, [Beekman] was very adamant about me not returning to the home, that she no longer welcomed services from our agency, and had made some statements that were pretty concerning, regarding the safety of the home." *Id.* at p. 59. She stated that Beekman had told her that Beekman might get a gun and kill C.B. Allison added that this statement made her feel uncomfortable so she left the home.

{¶38} Allison explained that C.B. had exhibited behaviors powered by choice rather than by any mental conditions because he behaved well while in foster care, but was nothing but problematic at home with Beekman.

{¶39} Allison testified that her conversations with Beekman were dependent on C.B.'s presence. If C.B. was not in the room, then Beekman would be more receptive to help and criticism. If C.B. was in the room, then Beekman would interrupt the sessions by defending C.B.'s behavior.

{¶40} Allison stated that she believed C.B. did not care about the consequences of his actions. Although Allison had warned him several times of the days in JDC hanging over his head, C.B. would respond by saying something like, "What are they going to do about it?" *Id.* at p. 64.

{¶41} At the conclusion of Allison's testimony, DJFS rested. C.B. did not present any evidence and rested.

{¶42} A brief recess was held so that the court could proceed to disposition.

{¶43} Upon reconvening, the court granted DJFS's motion to dissolve the stay of foster care. In doing so, the court stated,

> * * * [C.B.] has been on probation since 2010, nothing has gotten his attention and the court is concerned for his future. He has had numerous services, including: probation, supervision, foster care, strengthening families, individual counseling, detention, house arrest, community services, privileges such as driving and electronic devices removed because of his behaviors, but they don't improve.
>
> [C.B.] continues to alarm family members; probation is called; law enforcement is called to his house because of the disfunction [sic.]
>
> Before and after this motion was filed [C.B.] has broken the rules: He missed his probation appointments; he's verbally abusive towards his mother; has broken into her medicine box; broken the doorjamb on her bedroom; thrown food on her; he makes bombs because he's bored; mom has been given suggestions on how to help the situations but there was no follow-through.
>
> Overall, there is concern for the safety of this seventy-four-year-old mother, with an aggressive, disrespectful sixteen-year-old, who does what he wants; and safety concerns for [C.B.] when this same mother, who constantly defends him, says she should get a gun and shoot him.
>
> * * *
>
> Therefore, the court finds that it is in [C.B.'s] best interest to dissolve the state [sic] of foster care and place him in the custody of job and family services; he will be continued on juvenile probation. The department has used more than reasonable efforts to prevent this

-12-

but has not had - - gotten the cooperation or response it needs from mother and C.B. to prevent this placement.

*Id.* at p. 80-82.

**{¶44}** DJFS moved to vacate the review hearing due to its motion to dissolve the stay of foster care being granted. The court granted DJFS's motion to vacate on September 24, 2015.

**{¶45}** The court memorialized its decision granting DJFS's motion to dissolve the stay of foster care on September 24, 2015. In its written decision, the court found that "several sanctions and several resources have been utilized to assist this juvenile and his family, but the juvenile continues to alarm others and have law enforcement called to handle situations. * * * There is a safety concern for the 74 year old mother given the juveniles [sic] action toward her." (Docket No. 106, p. 2.)

**{¶46}** C.B. filed this timely appeal, presenting the following assignment of error for our review.

*Assignment of Error*

**THE JUVENILE COURT BELOW ABUSED ITS DISCRETION BY PLACING [C.B.] IN FOSTER CARE THAT WAS NOT REASONABLY CALCULATED TO PROVIDE FOR THE CARE, PROTECTION, AND MENTAL AND PHYSICAL DEVELOPMENT OF THE CHILD.**

**{¶47}** In his sole assignment of error, C.B. argues that the trial court erred by granting DJFS's motion to dissolve the stay of foster care. We disagree.

{¶48} "Pursuant to R.C. 2152.19(A)(4), a juvenile court has broad discretion to craft an appropriate disposition for a child adjudicated delinquent." *In re T.V.S.*, 3d Dist. Hancock Nos. 5-08-22, 5-08-31, 2009-Ohio-913, ¶ 19.

> Nevertheless, R.C. 2152.01(B) provides that dispositions must be 'reasonably calculated' to achieve certain statutory purposes. Those purposes are 'to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender.

*Id.*, quoting R.C. 2152.01(A). Accordingly, we review the trial court's disposition under an abuse of discretion standard. *In re D.S.*, 111 Ohio St.3d 361, 2006-Ohio-5851, ¶ 6. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Id.*

{¶49} C.B. argues that the trial court's disposition was purely punitive in nature and that "juvenile disposition statutes do not exist merely to punish children and prevent future crime * * *." *In re R.C.*, 164 Ohio App.3d 628, 2005-Ohio-6451, ¶ 49 (7th Dist.). Although we agree that the purposes of juvenile disposition extend beyond punishment and deterrence, we are unpersuaded by C.B.'s argument that the trial court's disposition was purely punitive in nature. Rather, we agree with DJFS's position that the trial court considered several factors,

including Beekman's safety, C.B.'s safety, and all the services and resources that were provided to the family.

**{¶50}** Regarding Beekman's safety, Mays testified that Beekman was 74 years old at the time of the hearing. Mays stated that C.B. and Beekman had gotten into several intense arguments since C.B. was reunified with Beekman. He explained that Beekman would have to call her other adult children over to the house to calm C.B. down or take him out of the house. Mays spoke of the incident where C.B. kicked in Beekman's bedroom door. He added that C.B. had told him that C.B. had hit Beekman so many times that C.B. could not remember the exact number. Deputy Verhoff testified about the incident he was called out to the house for and how C.B. told him that police had been called out to the house on prior occasions. After hearing this testimony, it is clear, from the record, that the court took this into account when dissolving the stay of foster care. Specifically, the court stated, "Overall, there is concern for the safety of this seventy-four-year-old mother, with an aggressive, disrespectful sixteen-year-old, who does what he wants[.]" Trial Tr., p. 81.

**{¶51}** There was also testimony regarding concerns for C.B.'s safety in the family home. During one of her home visits with Beekman, Allison testified that Beekman told her that Beekman might buy a gun and just kill C.B. This statement and the fact that arguments seem to be a daily occurrence between C.B. and

Beekman raise concerns for C.B.'s safety. The court clearly considered this factor, when it stated, "safety concerns for [C.B.] when this same mother, who constantly defends him, says she should get a gun and shoot him." *Id.* There was also testimony presented that C.B. would make "works bombs" and had stolen some of Beekman's prescription medication.

{¶52} Finally, Beekman and C.B. were provided with several different services and resources to prevent the placement of C.B. in foster care. Specifically, Mays testified that C.B. was placed on house arrest; C.B.'s electronic devices were taken from him; C.B. was placed into a drug counselling program and given other forms of counseling, including in-house counselling; C.B.'s driver's permit was taken; C.B. had been placed in the JDC three times as a consequence for his behavior; C.B. was ordered to do work at the probation office and even performed litter duty at the county fair. Even after trying all of these methods, C.B. continued to have problems.

{¶53} The only thing that seemed to be helpful for C.B. was when he was placed into foster care. Allison testified that C.B. was placed in foster care in January 2014. Being in foster care provided C.B. with some much needed structure. While C.B. was in foster care, Allison stated that C.B.'s treatment was consistent. C.B. took his medication, performed chores, attended counseling, was disciplined when appropriate, and was not allowed to throw tantrums. Allison

testified that due to C.B.'s progress while in the foster home C.B. could be reunified with Beekman. Thus, the trial court found that it would be in C.B.'s best interest if C.B. was placed into foster care.

**{¶54}** Upon a review of the record, we find that the trial court did not abuse its discretion when it granted DJFS's motion to dissolve the stay of foster care. Evidence was presented, which showed safety concerns for both the juvenile and the mother. Further, testimony was presented that showed ample resources and services were provided to the family and that none seemed to help. The one thing that seemed to help C.B. was when he was placed into foster care in 2014. While there, his behavioral issues improved and he was reunified with his mother after six months. Thus, the trial court did not err by granting DJFS's motion.

**{¶55}** Accordingly, C.B.'s sole assignment of error is overruled.

**{¶56}** Having found no error prejudicial to the appellant, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON and WILLAMOWKSI, J.J., concur.**

**/jlr**